## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

CLONNIE C. CARPENTER, ADMINISTRATOR OF THE ESTATE OF
NEIL MADISON CARPENTER, DECEASED v. ATLANTIC
COAST LINE RAILROAD COMPANY.

DANIEL CORBETT CASEY, ADMINISTRATOR OF THE ESTATE OF
GEDDY CARROLL CASEY, DECEASED v. ATLANTIC COAST
LINE RAILROAD COMPANY.

January 25, 1954.

Record Nos. 4133, 4134.

Present, All the Justices.

The opinion states the case.

*William Old, D. W. Murphey*, for Clonnie C. Carpenter, Administrator of the Estate of Neil Madison Carpenter, Deceased and for Daniel Corbett Casey, Administrator of the Estate of Geddy Carroll Casey, Deceased, plaintiffs in error.

*J. M. Townsend*, for Atlantic Coast Line Railroad Company, defendant in error.

MILLER, J., delivered the opinion of the court.

Neil Madison Carpenter and Geddy Carroll Casey, twelve and thirteen years of age respectively, hereinafter referred to as decedents, were instantly killed about five o'clock p. m. on January 27, 1951, when struck by a locomotive of the Atlantic Coast Line Railroad Company.

Each decedent's administrator instituted an action for $15,000[1] against the company under section 8-633, *et seq.*, Code of 1950, commonly called the death by wrongful act statute, and alleged that the death of his decedent was caused solely by the negligence of employees of the railroad company.

The actions were tried together and a verdict of $2,500 was returned in favor of each administrator. Upon motions of the defendant these verdicts were set aside by the court and judgments entered in favor of the company *non obstante veredicto*; from those judgments writs of error were granted.

The opinion of the trial judge discloses that the verdicts were set aside solely because he concluded that the evidence failed to establish that defendant was guilty of any negligence.

The testimony shows that decedents were of average intelligence and education, and the size and height of each

---

[1] By Acts of General Assembly, 1952, Ch. 60, p. 83, the maximum amount of recovery allowed for death by wrongful act was increased to $25,000.

were about normal for boys of their respective ages, the older being 4 feet, 10 inches, tall and the younger 4 feet, 8 inches, in height. Yet as both were under fourteen years of age, they were presumed to be incapable of negligence, *P. L. Farmer, Inc.* v. *Cimino*, 185 Va. 965, 970, 41 S. E. (2d) 1, and it is conceded that the jury was warranted in so holding.

Thus the only question presented is whether or not the evidence sustains the finding of the jury that defendant's employees had been guilty of negligence that proximately caused the accident.

In Chesterfield county where the accident occurred, defendant's standard gauge double-tracked railroad extends in a northerly and southerly direction. It is maintained upon a built-up bed or dirt fill, and by means of a trestle passes over the single track railroad of the Seaboard Air Line Railroad Company, which extends in an easterly and westerly direction.

Along the center of the trestle midway between the two tracks and on each outer edge or side of the trestle are dark colored iron girders, which extend upward from the level of the track, and thus constitute suspension supports for defendant's railroad. The outside girders extend 3 feet, 9 inches, above the level of the crossties, and they are 1 foot, 4 inches, wide, and enclose the east and west sides of the entire trestle. The center girder extends 2 feet, 10 inches, above the level of the ties and is 1 foot, 8 inches, wide. That girder constitutes a solid partition between the tracks from the north to the south end of the trestle.

Neither the length nor width of the trestle is stated in the evidence nor is the distance between the two tracks given. It does, however, appear from exhibits that the length of the trestle was amply sufficient to bridge the Seaboard Air Line track and that the two girders along the trestle's outer edges and the one between the tracks were a few feet distant respectively from the outer and inner rails.

The train involved in the accident was made up of a Deisel locomotive operating in reverse and pulling one box

car. It was traveling in a southerly direction along the east or northbound track at a speed of 30 to 35 miles per hour. There are five windows in the rear of the engine through which a lookout may be kept when it is thus backed or driven in reverse. As defendant's engine approached and entered upon the trestle from the north, a long train was moving in a westerly direction upon the lower track and passing under the trestle. Noise from that train made it difficult to hear other sounds.

In the general area of the trestle defendant's railroad curves to the left—that is, to the east—when viewed in the direction in which its train was proceeding. Thus when the trestle is approached along the curving track, each girder obscures a wider and considerably greater portion of the trestle and roadbed, particularly on the right or west side, than it would obscure if the railroad were not curved.

Plaintiffs proved that at the south end of the trestle a foot path led up each side of the fill from the track below, and in the immediate area paths extended along defendant's roadbed close to the ends of the crossties. All of these paths were used as walkways by people in the community to such an extent that defendant had, or must be deemed to have had, knowledge of that use. The company does not now contend that it did not owe the duty to use reasonable care to discover and avoid injury to pedestrians whom it might reasonably expect to be upon its tracks in this area. *Washington & Old Dominion R. R.* v. *Taylor, Adm'x, etc.*, 188 Va. 458, 468, 50 S. E. (2d) 415.

At the time of the accident the engine was occupied by six of defendant's crewmen. One was an instructor and one a student switchman. These two employees were engaged with duties in the engine cab where they could not keep a lookout ahead. The other four crewmen were W. M. Myrick, the regular engineer, H. L. Elks, the fireman who, however, is also a classified engineer and as such was operating the locomotive under the supervision and control of Myrick, yard foreman James R. Morris, and switchman R. M. Kirkland.

The two engineers were called by plaintiffs as adverse witnesses, but Morris and Kirkland testified at the instance of defendant. It appears from the testimony of these four men that engineer Elks was seated at and looking ahead through the window nearest the west side of the engine; Myrick was standing and looking ahead through the window next to him. Kirkland was looking through the center window, and Morris was seated at and looking through the window nearest to the east side of the engine. However, none of these crewmen saw the boys until they suddenly appeared on the east track at the south end of the trestle a few feet from the center girder, and only some eight to ten feet in front of the engine.

The testimony of Myrick as to the location and movements of decedents when he first saw them and their proximity to the moving engine follows:

"Q. State what you saw just before the accident.

"A. Well, when I got about eight or ten feet—you may say six or eight feet—of them I saw those two boys come from the center of the bridge—from the middle girder of this bridge. One of them looked like he practically stopped in the track. I term him the smallest boy; and he was in a crouched position; and the other one was following in his steps.

"Q. You considered you were about eight feet from the boys before you saw them?

"A. Yes, sir, eight or ten feet——."

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. And if you were ten feet from them, you saw the boys about a quarter of a second before the impact?

"A. Yes, sir.

"Q. In other words, your first glimpse of the boys and the impact was almost instantaneous?

"A. It was momentary.

"Q. It was momentary?

"A. Yes, sir.

"Q. You never saw them until just about the instant of the impact?

"A. That is right."

\* \* \* \* \* \* \*

"Q. And the Seaboard train was going under the bridge at the time this impact took place?

"A. That is right.

"Q. Did the boys look like they were looking at the Seaboard train?

"A. Their heads were turned to look at the Seaboard train."

\* \* \* \* \* \* \*

"Q. Had that Seaboard train passed at the time of the impact?

"A. The rear, or two or three cars were on the east side of the track when the impact occurred.

"Q. And the rest of it was on the west side?

"A. Yes, sir. And the rear end of the train was passing at the time of the impact."

Engineer Elks' testimony as to what he was doing and where the two boys were when he got a fleeting view of them a moment before they were struck is disclosed by the following questions and answers:

"Q. Now, when did you see these boys on the track?

"A. Well, I never did see the boys completely. I just glimpsed them. And, when Mr. Myrick hollered 'Lord have mercy,' I looked up at him, and then I looked down, and then I glimpsed the boys.

"Q. Where were you looking when you glimpsed them?

"A. I was looking straight up the track.

"Q. And you never did see the boys completely?

"A. No, sir."

\* \* \* \* \* \* \*

"Q. Now, you did not see the boys emerge from any point onto the track?

"A. No, sir.

"Q. And your vision of the boys was just an instantaneous thing?

"A. Yes, sir.

"Q. So you do not know where the boys came from?

"A. No, sir, I do not."

Both Kirkland and Morris testified that they were keeping a lookout ahead and that their attention was momentarily attracted by the train passing on the lower level track. They were startled by Myrick's exclamation, "Lord have mercy," and Kirkland then "got a glimpse of the two little boys." They were then "on the south end of the bridge" facing east but in a somewhat "stooped position, looking east and looking down" and only a few feet from the engine. Morris never saw them before the collision.

Plaintiffs obtained jury verdicts in their favor and had there been any conflicts in the evidence, they would have been entitled to have those conflicts resolved in their favor. But here there are no conflicts in the evidence, and no fact or circumstance is disclosed, nor can any reasonable inference be drawn from those proved, upon which to conclude that the crewmen could or should have seen decedents before they did. The testimony of the witnesses to the tragedy is to the effect that the boys, walking or running eastward and in a crouched position, suddenly appeared on the track only a few feet from the center girder. Just where they came from is not shown, but the girder, located as it was upon a curved portion of the track, was sufficiently tall, wide and long to have obscured the boys from the vision of the train crew if they were slightly crouched down until they emerged immediately in front of the engine and too close to be warned of its approach.

Elks and Myrick were adverse witnesses, yet they were called by plaintiffs, and their testimony is not incredible nor is it in conflict with any other evidence. Plaintiffs are thus bound by the clear and reasonable statements of these witnesses as to how the accident occurred. *Boyd* v. *Brown*, 192 Va. 702, 66 S. E. (2d) 559.

Though all the evidence be viewed in the light most favorable to plaintiffs and all just inferences deducible therefrom resolved in their favor, the proved facts and circumstances are clearly insufficient to show that the crewmen failed to keep a reasonable lookout for pedestrians whom they might have reasonably expected to be upon the track. At most it is mere surmise and speculation, and not a just inference from the facts, to say that the crewmen should have seen the boys sooner and in time to warn them and avoid the tragedy.

We conclude that the evidence was insufficient to sustain a finding of negligence on the part of defendant, and the trial court committed no error when it granted the motions to set aside the verdicts. The judgments are accordingly affirmed.

*Affirmed.*